JM:EK:WPC
F.#2008R00783

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**M-11-989**

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

ERIC ARONSON,
VINCENT BUONAURO and
ROBERT KONDRATICK,

              Defendants.

- - - - - - - - - - - - - - - -X

**FILED UNDER SEAL**

COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF AN ARREST WARRANT
(18 U.S.C. § 1343)

EASTERN DISTRICT OF NEW YORK, SS:

      MATTHEW B. TAYLOR, being duly sworn, deposes and says

that he is a Special Agent with the Federal Bureau of

Investigation ("FBI"), duly appointed according to law and acting

as such.

      Upon information and belief, there is probable cause to

believe that in or about and between August 2006 and December

2010, both dates being approximate and inclusive, within the

Eastern District of New York and elsewhere, defendants ERIC

ARONSON, VINCENT BUONAURO and ROBERT KONDRATICK, together with

others, having devised a scheme and artifice to defraud and to

obtain money and property by means of materially false and

fraudulent pretenses, representations and promises, did knowingly

and intentionally cause to be transmitted by means of wires in

interstate commerce writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice.

(Title 18, United States Code, Section 1343).

The source of Your Affiant's information and the grounds for his belief are as follows:[1]

1.   I have been Special Agent with the FBI for approximately 2 ½ years and am currently assigned to the New York Division, where I am tasked with investigating securities fraud, wire fraud and other white collar crimes.  During my tenure with the FBI, I have participated in white collar fraud investigations and have participated in all aspects of investigations, including conducting surveillance, executing search warrants, debriefing informants, interviewing witnesses, reviewing and analyzing recorded conversations, and analyzing telephone toll information. During the course of these investigations, I have served as the lead investigator in the investigation of persons involved in securities fraud, wire fraud, and money laundering.

2.   This affidavit is based on my own participation in the investigation, my conversations with other government agencies, law enforcement officers and witnesses and victims, as well as my review of documents, including but not limited to bank records and email records.  Because this affidavit is being

---

[1]   As this affidavit is submitted only to illustrate that probable cause exists to believe that the defendant committed certain crimes, all the facts known to me as a result of my investigation have not been included.

provided for a limited purpose, I have not described all of the facts relating to this matter of which I am aware. In addition, any conversations described below have been described in sum and substance and in part unless otherwise noted.

I.   The Defendants

3.   The defendant ERIC ARONSON resided in Syosset, New York. ARONSON is the founder of Permapave Industries and, in or about and between August 2006 to December 2010 (the "relevant period"), held various management positions at one or more of the below described Permapave Entities. Additionally, ARONSON claimed to be the exclusive sales representative of Permapave products for all of North and South America.

4.   In 2000, the defendant ERIC ARONSON was convicted of wire fraud and conspiracy to defraud the United States. On or about December 14, 2000, the Honorable Deborah A. Batts sentenced ARONSON to, inter alia, a forty-month term of imprisonment and restitution in the amount of $2,770,212. See U.S. v. Aronson, No. 98 Cr. 564, Final Judgment, ECF No. 64 (S.D.N.Y. Dec. 14, 2000).

5.   The defendant VINCENT BUONAURO resided in West Islip, New York. During the relevant time period or at certain times within that period, BUONAURO held various management positions at one or more of the below described Permapave Entities. BUONAURO resigned from his positions with one or more of the below described Permapave Entities in or about the late

3

summer or early autumn of 2008.

6.    The defendant ROBERT KONDRATICK resided in
Syosset, New York.  During the relevant time period or at certain
times within that period, KONDRATICK held various management
positions at one or more of the below described Permapave
Entities.

II.   The Permapave Entities

7.    Permapave Industries, LLC was a New York limited
liability company established in or about 2006 that, according to
its business plan, was "the US based licensed reseller of
PermaPave™ products throughout the Americas."[2]  The PermaPave™
products were manufactured in Australia.  The business plan
further stated that Permapave Industries was "seeking capital to
develop the infrastructure required to support manufacturing and
product rollout starting with the United States."  This business
plan described Permapave products as "permeable pavers [that]
consist of natural stone substrate engineered to allow water flow
through."  The website maintained by Permapave Industries,
permapave.com, described its product as of July 24, 2011, as
"developed to filter rainwater, eliminate outfall pollution and
enable clean water to recharge subterranean aquifers, an
undeveloped source of urban water worldwide" and that its
products are "sought after worldwide and continue to provide

---

[2]    Permapave is the trademarked name for paving stones or
"pavers" that are used in the construction of patios, sidewalks
and plazas.

4

solutions to increasing environmental problems."

8. Permapave USA, Corp. was a New York corporation that was established in or about 2006 and was dissolved on or about April 27, 2011. During its existence, Permapave USA was the parent of Permapave Industries, and like Permapave Industries, Permapave USA purported to sell Permapave products.

9. Permeable Solutions, Inc. ("Permeable Solutions") was a Nevada corporation established in or about 2008 and was the parent company of Permapave USA. On or about January 11, 2011, an involuntary petition of bankruptcy was filed against Permeable Solutions in the United States Bankruptcy Court for the Eastern District of New York.

10. Permapave Distributions was a New York corporation established in or about 2008. The investigation has revealed that the only business activity conducted by Permapave Distributions was the raising of funds through the sale of promissory notes as further described below.

11. Verigreen Group was a Nevada limited liability company whose corporate status was revoked, which was the parent company of Permeable Solutions and other above-mentioned entities.

12. Verigreen, LLC, was a Delaware limited liability company and was the parent of Verigreen Group. Verigreen maintained a website, verigreeninc.com, which as of July 24, 2011, described Verigreen as a "distributor of eco-friendly

products and designs" that provided the following products: Permapave, Dymonrock, Lumi-Coat and Dymoncrete.

13. Dash Development was a New York limited liability company that was established in or about 2006. The investigation has revealed that it purported to be a health, fitness and self-improvement business located in Long Island, New York.

14. Aron Holdings, Inc. was a New York corporation established in or about 2006. The investigation has revealed that defendant ERIC ARONSON indentified himself as the owner and agent of Aron Holdings and that ARONSON told at least one investor, whose identity is known to your affiant, that Aron Holdings was the business ARONSON used to order Permapave pavers from Australia.

15. Interlink-US Network, Ltd. ("Interlink"), based in Los Angeles, California, and formerly known as NuTech Digital, Inc., is a company that, according to a review of Yahoo! Finance on or about August 26, 2011, engages in marketing and delivering a range of telecommunication and data services in the United States. Interlink's common stock is traded over the counter on what is commonly referred to as the pink sheets. On or about June 28, 2010, Verigreen Group became the majority shareholder of Interlink.

16. The above entities will be hereinafter referred to collectively as the "Permapave Entities" unless identified individually. The last known office maintained by the Permapave

6

Entities, as of January 2011, was located at 575 Underhill Boulevard, Suite 125, Syosset, New York, and was previously located at 366 North Broadway, Suite 200, Jericho, New York.

III. Solicitation of Loans as Investments

17.  Since approximately August 2006, the defendants ERIC ARONSON, VINCENT BUONAURO and ROBERT KONDRATICK, together with others, solicited individuals to invest in one or more of the Permapave Entities.

18.  The defendants ERIC ARONSON and VINCENT BUONAURO solicited investors telling them that their investment would be used to purchase and ship containers of Permapave pavers to the United States from manufacturers of the pavers in Australia. ARONSON and BUONAURO advised most investors that the sale of each container load of Permapave pavers financed by a promissory note would occur approximately 90 days from that promissory note's execution.  The promissory note promised a fixed rate of return and a specified date of return.  Some promissory notes were also accompanied by a "use of funds" agreement that explained and constrained how and for what purpose the investor funds would be used, namely, the purchase of shipping containers full of Permapave pavers from Australia to the United States.  ARONSON and BUONAURO told investors that once those containers were sold in the United States, the investors would receive their principal investment along with the promised interest.  Each investor would then be paid immediately after the sale.  ARONSON further advised

investors that ARONSON had purchased an exclusive license from the Australian Permapave company, which purportedly made ARONSON the exclusive distributor of Permapave pavers for North and South America.

19. The defendants ERIC ARONSON and VINCENT BUONAURO also told investors that the proceeds raised from the promissory notes would be used exclusively to pay for the purchase and shipment of Permapave pavers from Australia in order to satisfy existing customer demand and that investor returns were based on product sales.

20. The interest on the promissory notes varied. Most of the promissory notes provided for monthly rates of return from 7.8% to 33.3%, i.e., 94% to 400% per annum. Some of the "use of funds" agreements stated that the

> funding may be used by the Company [Permapave Industries, LLC] for the purchase of containers of Permapave pavers only.

21. The defendants ERIC ARONSON and VINCENT BUONAURO told investors who executed the promissory notes and "use of funds" agreements that the Permapave Entities had a high demand for Permapave pavers but because of ARONSON'S prior criminal record, the companies were unable to obtain traditional bank financing.

22. The defendants ERIC ARONSON, VINCENT BUONAURO and ROBERT KONDRATICK executed promissory notes and "use of funds" agreements for investments, in or about and between August 2006

and July 2010, to approximately 140 investors, raising approximately $26.3 million.       23.  The promissory notes were issued by several Permapave Entities, including Dash Development, Permapave Industries, Permeable Solutions, Permapave USA or Permapave Distributions.  The promissory notes were each signed by the associated investor as well as by one or more of the defendants ERIC ARONSON, VINCENT BUONAURO or ROBERT KONDRATICK.

24.  The "use of funds" agreements were issued by Permapave Industries and Permapave USA in or about and between July 2008 and April 2010.  These agreements were signed by the associated investor as well as either the defendant ERIC ARONSON or the defendant ROBERT KONDRATICK.

IV.  Convertible Debenture

25.  In or about January 2009, the defendant ERIC ARONSON persuaded many investors to exchange their promissory notes for convertible debentures[3] issued by Permeable Solutions. Those convertible debentures changed the entity obligated to return the investors' investments and the terms of repayment as explained below.

26.  On or about January 8, 2009, Permeable Solutions's attorney sent a letter to the investors holding promissory notes and "use of funds" agreements issued by the various Permapave

---

[3]    Convertible Debenture is a type of loan issued by a company that can be converted into stock by the holder of the loan.

Entities.   The letter stated in pertinent part that

> Eric [Aronson] would like the opportunity to
> discuss with you your investment (if you have
> not met with Eric already), and his offer to
> convert any promissory or other note you hold
> in Permapave into a convertible debenture
> with PSI [Permeable Solutions].

This letter further indicated,

> If you decide to accept the offer, you will
> assign your promissory note to PSI [Permeable
> Solutions] and, in return, be paid 1%
> interest every month, with the principal and
> accrued interest paid either in a lump sum in
> 24 months, or earlier if the company goes
> public or is bought by a third party.

27.   The defendant ERIC ARONSON met with several

promissory note holding investors in or around January 2009 at

the offices of the Permapave Entities.   During this meeting,

ARONSON advised investors that he did not have the funds to

satisfy their promissory notes.   ARONSON told the investors that

he had created a convertible debenture that would pay 1% monthly

interest on the original investment, not the amount owed.

ARONSON informed the investors that he would open a separate bank

account and return all the investors' money in two years.

28.   Approximately 72 investors exchanged their

promissory notes for the convertible debentures.

29.   The convertible debentures were issued by

Permeable Solutions in or about and between January 2009 and May

2009.   In each case, the associated investor signed the

convertible debenture as well as either the defendant ERIC

10

ARONSON or the defendant ROBERT KONDRATICK.

V.   Conversion of Debentures into Permeable Solutions Stock

        30.   In or about the summer of 2009, the defendant ERIC
ARONSON told investors that one or more of the Permapave
Entities, including Permeable Solutions, had been sold or was
about to be sold and urged the investors to convert their
investments, be they promissory notes, "use of funds" agreements
and/or convertible debentures, via a written agreement (a
"conversion agreement"), into shares of Permeable Solutions, Inc.
common stock, so as to reap substantial financial benefits from
the expected sale of the company.

        31.   Approximately 53 investors signed conversion
agreements converting their promissory notes, "use of funds"
agreements or convertible debentures into shares of Permeable
Solutions common stock.

        32.   The conversion agreements were issued by Permeable
Solutions in or about and between January 2009 and April 2010.
The conversion agreements were signed by the associated investor
and defendant ROBERT KONDRATICK.

V.   Conversion of Permeable Solutions Stock into Interlink Stock

        33.   On or about June 28, 2010, Verigreen Group became
the majority shareholder of Interlink.  On July 14, 2010,
Interlink issued a Form 8-K that advised that the Verigreen Group
was now the majority shareholder.  Interlink filed periodic
reports, including Forms 10-Q and 10-K, with the United States

                              11

Securities and Exchange Commission ("SEC"), and its common stock was registered with the SEC.

34.  In or about September 2010, Permeable Solutions sent investors who were owed shares in Permeable Solutions a letter stating in pertinent part that

> [b]ecause the original Convertible
> Debenture was based on an improper
> rate of interest, we recalculated
> all of the Convertible Debentures
> at 15% per annum.

The letter further stated that investors would receive

> shares of common stock of Interlink
> in exchange for [their] shares of
> Permeable Solutions,
> Inc. . . . [b]ased on a valuation
> of five shares of Permeable
> Solutions for one share of
> Interlink.

35.  Permeable Solutions delivered shares of Interlink common stock to approximately 30 of the 53 investors who had previously agreed to convert their promissory notes, "use of funds" agreements and/or convertible debentures into shares of Permeable Solutions common stock.  The Interlink common stock was worth a small fraction of the investors' original investment.

VI.  Victim Interviews

36.  During the course of the investigation, the government interviewed numerous individuals who were victims of the defendants' scheme.  Although the details vary from person to person, the victims' accounts are essentially the same.  Each

12

investor gave money to the defendants because of promised guaranteed positive rates of return. All of the victims consistently reported that they later had great difficulty getting their money back from the defendants.

A.   Victim #1

37.   Victim #1, an individual whose identity is known to your affiant, was introduced to the defendant ERIC ARONSON by a friend in or about August 2006.  ARONSON explained what Permapave was and asked Victim #1 to invest in PERMAPAVE. ARONSON told Victim #1 that Victim #1 would have his investment returned with interest in a short period of time.  In or about August 2006, Victim #1 invested $50,000, and ARONSON provided him with a promissory note, not from Permapave but from DASH DEVELOPMENT.

38.   In or about May 2008, after Victim #1 had not received any return on his $50,000 investment, he met with ARONSON and asked about the status of his investment.  ARONSON apologized for the lack of performance but advised Victim #1 that ARONSON was arranging for the shipment of Permapave pavers to the United States from Australia in cargo containers.  ARONSON told Victim #1 that if he invested additional money to procure the Permapave containers, Victim #1 would receive his the principal and interest on his initial $50,000 investment as well as the principal and profit from the container investment sales.

39.   In or about May 2008, Victim #1 invested in 14 Permapave shipping containers at $17,000 each, for a total of $238,000.  ARONSON promised Victim #1 that his first payment would arrive within three to six months after his investment.

40.   When Victim #1 did not receive any payments after the passage of six months, he spoke with ARONSON.  ARONSON told him that Permapave was in the process of being sold and that, at the conclusion of the sale, Victim #1 would receive back all his invested monies.  Victim #1 has not received any payment in connection with his investment.

B.   Victim #2

41.   Victim #2, an individual whose identity is known to your affiant, first invested in Permapave through defendant VINCENT BUONAURO in or about mid-2007.  BUONAURO told Victim #2 that if he invested $100,000 in PERMAPAVE, Victim #2 would earn a return of $70,000.  BUONAURO also informed Victim #2 that Victim #2 did not need to know all the details of the investment because they were far too involved.  In or about mid-2007, Victim #2 gave BUONAURO a check for $100,000 to invest in PERMAPAVE. Fortunately, six months later, Victim #2 received $170,000 for his investment.

42.   BUONAURO later asked Victim #2 to continue investing in Permapave, and stated that if Victim #2 invested $500,000, he would receive a 50% return on the investment.  In or about April 2008, Victim #2 gave BUONAURO a check for $500,000 to

invest in PERMAPAVE.  BUONAURO provided Victim #2 with a promissory note for the investment.

43.  In or about the summer of 2009, after Victim #2 did not receive any returns on his investment, Victim #2 met with the defendants ARONSON and BUONAURO.  At the conclusion of the meeting, ARONSON promised Victim #2 that he would receive his $500,000 and 50% return shortly after Thanksgiving 2009.  Victim #2 did not receive the returns.

44.  In or about December 2009, Victim #2 met with the defendant ERIC ARONSON, who told Victim #2 that his investment funds had been directed toward another investment and that the funds were not therefore, available to be returned.  During the meeting, ARONSON provided Victim #2 with another promissory note to replace the $500,000 promissory note provided to him by BUONAURO.  Under the terms of the new note, Victim #2 was to receive 1% interest each month on his $500,000 investment, which Victim #2 received for only two months thereafter.  ARONSON met with Victim #2 and other investors in or about early 2010 and told them that their funds could not be returned presently.

45.  In or about December 2010, ARONSON told Victim #2 that he would receive his money in January 2011.  ARONSON also provided Victim #2 with a contract to convert his $500,000 investment into shares of INTERLINK stock.  ARONSON told Victim #2 that by converting his investment into INTERLINK stock, Victim #2 could sell the Interlink stock to recoup his money.   Victim

15

#2 did not sign the contract nor did he receive any funds. In total, Victim #2 has recouped only a small fraction of his $500,000 investment.

    C.   <u>Victim #3</u>

46. Victim #3, an individual whose identity is known to your affiant, met with BUONAURO and ARONSON in or about 2007. ARONSON told Victim #3 that Permapave needed investment funds to facilitate the shipment of containers containing Permapave pavers into the United States. ARONSON told Victim #3 that each container cost $25,000 and that for every $25,000 investment, the investor would be paid the principal plus 10% interest within 30 days of the investment.

47. In or about March 2007, Victim #3 invested $100,000 in Permapave. After 30 days, Victim #3 received $110,000. ARONSON solicited another investment from Victim #3 in or about April 2007. Victim #3 invested an additional $100,000. After six months without any payment, ARONSON informed Victim #3 that Victim #3 would receive an interest payment every month. In or about and between June 2007 and mid-2008, Victim #3 received checks in the mail from one or more of the Permapave Entities ranging from $5,000 to $8,000. The checks received totaled $60,000. No other checks were received.

48. After the checks stopped, the defendant ERIC ARONSON told Victim #3 that ARONSON was in the process of selling one or more of the Permapave Entities. According to ARONSON,

during the sale period, Victim #3 would receive 1% interest on Victim #3's remaining investment. After one or more of the Permapave Entities were sold, ARONSON explained, Victim #3 would receive a lump sum return of his total investment. Victim #3 received approximately six payments of $400 each by mail. In or about June 2009 the payments stopped. Victim #3 has not received any additional payments.

49. In or about March 2010, Victim #3 met with the defendant ERIC ARONSON, who stated that ARONSON needed $50,000 to complete the purchase of a shell company. If Victim #3 provided $50,000, ARONSON claimed, then Victim #3 would receive an additional 10% percent return. In or about April 2010, Victim #3 provided ARONSON a check for $50,000. On the same day that Victim #3 provided the check, ARONSON provided Victim #3 with three separate checks for $50,000 from one or more of the Permapave Entities. ARONSON instructed Victim #3 to deposit one check per month. All three of those checks bounced due to insufficient funds.

D.   Victim #4

50. The defendant VINCENT BUONAURO solicited Victim #4, an individual whose identity is known to your affiant, to invest in Permapave by telling Victim #4 about the defendant ERIC ARONSON's Permapave distribution license. BUONAURO told Victim #4 that ARONSON preferred to deal with individuals willing to invest in Permapave, rather than banks. BUONAURO further told

17

Victim #4 that the investment would last approximately two to three years with a rate of return of 50% over the course of the investment.

51.  In or about and between April 2007 and February 2008, Victim #4 invested $280,000 in Permapave.  In or about April 2007, Victim #4 wired $100,000 from his account held outside of New York state into an account controlled by Permampave Industries in New York state.  Victim #4 received six checks, in or about and between August 2007 and August 2008, totaling $87,500 as returns on Victim #4's investment in Permapave.  In or about the summer or autumn of 2008, the defendant VINCENT BUONAURO told Victim #4 that BUONAURO and the defendant ERIC ARONSON had had a falling out over problems related to payments to Permapave investors.

52.  Victim #4 later received an unsigned Secured Convertible Debenture contract by mail from Permeable Solutions. The contract provided for Victim #4's investment to be converted into equity in Permeable Solutions.  Under the new terms, Victim #4 would purportedly receive 1% interest payments monthly based on Victim #4's total investment principal.

53.  Victim #4 tried unsuccessfully to get in contact with the defendant ERIC ARONSON about the Secured Convertible Debenture contract.  Victim #4 never executed or returned the Secured Convertible Debenture contract.  However, Victim #4

received five 1% interest payments as per the Secured Convertible
Debenture contract's terms, totaling $14,000. The payments
stopped after the fifth payment. Victim #4 spoke to ARONSON, who
stated that Victim #4's payments would resume in or about July
2009. Victim #4 never received any additional payments.

54. On or about September 16, 2010, Victim #4 received
a letter from Permeable Solutions advising Victim #4 that the
Secured Convertible Debenture contract with Permeable Solutions
would continue but the interest payments could no longer be
guaranteed. The letter also informed Victim #4 that all principal
and interest on the investment would be paid back once the
contract expired in or about January 2011. Victim #4 did not
receive any payments. Victim #4 placed several telephone calls
to the defendant ERIC ARONSON which were never returned.

E.   Victim #5

55. Victim #5, an individual whose identity is known
to your affiant, was introduced to the defendant ERIC ARONSON
through a friend who was looking to invest in Permapave. In or
about October 2008, Victim #5 and Victim #5's friend met with
ARONSON. ARONSON explained Permapave products and told Victim #5
that ARONSON needed financing help in purchasing the rights to
sell Permapave products. ARONSON also stated that because he was
a convicted felon, no traditional lenders would work with
ARONSON. ARONSON told Victim #5 that the investment funds would

19

be used to buy Permapave pavers from Australia and ship them to the United Staes in shiping containers.  Once the containers arrived in the United States, the entire order would be paid for and ARONSON would pay back the financiers.  ARONSON explained to Victim #5 that the entire process of ordering, importing, delivery and payment took 90 days, but paid an interest rate of 23.5% on the investment.  ARONSON also took Victim #5 to a Permapave manufacturing plant in Long Island, New York.  The investigation has revealed that, contrary to ARONSON's representations to Victim #5, that manufacturing plant did not produce a substantial amount of Permapave pavers.

56.  In or about October 2008, Victim #5 invested in one or more of the Permapave Entities with the condition that Victim #5's investment could be used only to purchase containers. Victim #5 wired ARONSON $255,000 from Victim #5's account held outside of New York state to the account held by Permapave Industries in New york state.   In or about January 2009, ARONSON wired Victim #5 the promised returns of $315,000 from an account held by Permampave USA in New York state to Victim #5's account outside of New York state.

57.  Over time, Victim #5 invested in a total of five container agreements with ARONSON for a total of $2,380,000. Victim #5 also invested with ARONSON to import Permapave paver manufacturing equipment.  Victim #5 invested $850,000 for the Permapave paver manufacturing equipment and was supposed to

receive a $1,262,500 return on that investment. Victim #5 was also offered a deal for a Permapave paver manufacturing plant in Florida. This deal was never consummated.

58. The defendant ARONSON told Victim #5 about Dymoncrete, a company owned by the Permapave inventors in Australia, which made a synthetic concrete named Dymoncrete. ARONSON informed Victim #5 that ARONSON was going to buy the distribution rights and an equity stake in Dymoncrete. Victim #5 invested $250,000, which was supposed to be used as the deposit for the equity stake in Dymoncrete according to ARONSON. ARONSON personally guaranteed Victim #5's $250,000 investment. ARONSON told Victim #5 that ARONSON traveled to Las Vegas, Nevada, to purchase the equity stake in Dymoncrete. Upon ARONSON's return from Las Vegas, however, ARONSON told Victim #5 that ARONSON did not buy Dymoncrete. Instead, ARONSON told Victim #5 that ARONSON bought another company called Lumi-Coat which made glow-in-the-dark paint.

59. In or about February 2009, the defendant ERIC ARONSON asked Victim #5 to help him with the Permapave business because other employees had left the business, and ARONSON needed the help. In or about and between March 2009 and November 2009, Victim #5 was employed at Permapave and worked there three days a week with a $250,000 pro-rated annual salary. Victim #5's paycheck, however, did not originate from Permapave, but rather

from Dymoncrete.  During Victim #5's employment, Victim #5 discovered that one or more of the Permapave Entities was not what the defendant ERIC ARONSON claimed it to be.  Several company documents, such as bank records and purchase orders, were unaccounted for, and it appeared that ARONSON owed people large sums of money.  Victim #5 also discovered that there were containers of Permapave pavers that could not be located and that ARONSON was using investors' money to pay for his business expenses.

60.  In or about the autumn of 2009, the defendant ERIC ARONSON failed to meet Permapave's payroll obligations to Victim #5.  Thereafter, Victim #5 and ARONSON separated, and Victim #5 filed a lawsuit against ARONSON.  The case was settled and ARONSON agreed to make four payments to Victim #5 as a form of repayment.  ARONSON did not make those payments, but later made small payments totaling $80,000.  In or about the summer of 2010, ARONSON told Victim #5 that ARONSON merged one or more of the Permapave Entities into a public shell company and that another individual, whose identity in known to your affiant, would be making a large capital investment in one or more of the Permapave Entities.  ARONSON promised to pay Victim #5's investment and legal fees, but Victim #5 received no payments. In total, Victim #5 invested $3,480,000 with ARONSON and received $1,470,000 in return, for a total loss of approximately $2,010,000.

E.    Victim #6

61.    In or about August 2009, Victim #6, an individual whose identity is known to your affiant, met the defendant ERIC ARONSON, who stated that he was importing Permapave pavers from Australia and was beginning to manufacture those pavers in the United States.  ARONSON further told Victim #6 that additional Permapave pavers were currently on order from Australia and that those pavers were pre-sold to fill existing purchase orders.

62.    The defendant ERIC ARONSON told Victim #6 that ARONSON was seeking investors to finance the purchase and importation of Permapave pavers.  A portion of those funds would also be used to build Permapave manufacturing plants in the United States.  ARONSON told Victim #6 that ARONSON guaranteed a 20% rate of return on the investment to be paid monthly.

63.    In or about September 2009, Victim #6 invested $150,000 into Aron Holdings, a company the defendant ERIC ARONSON claimed to own.  In or about November 2009, Victim #6 asked ARONSON why Victim #6 was not receiving the monthly 20% interest payments.  ARONSON stated that Victim #6 would be paid the 20% interest after one year, not monthly.

64.    In or about November 2010, Victim #6 again asked the defendant ERIC ARONSON for the 20% interest payment and principal investment.  ARONSON responded that because such an interest rate was considered usurious and criminal, ARONSON would not pay it.  Instead, ARONSON told Victim #6 that ARONSON would

find the current market interest rate in 30 days to pay Victim #6.  ARONSON never paid Victim #6 the interest or the principal owed.

VII. Improper Use of Investor Funds

      65.  The investigation has revealed that, contrary to the representations of the defendants ERIC ARONSON, VINCENT BUONAURO and ROBERT KONDRATICK, only a portion of funds originally raised by Permapave Entities was used to purchase and ship Permapave pavers from Australia.  Instead, a portion of the funds raised for Permapave was used to make payments to other investors in the scheme.  Another portion of the funds was used and misappropriated by ARONSON, BUONAURO and KONDRATICK for their own personal benefit.  A review of bank records further reveals that investor funds were used to pay expenses clearly unrelated to Permapave's business functions.

      66.  The defendants ERIC ARONSON, VINCENT BUONAURO and ROBERT KONDRATICK obtained approximately $26.3 million through the use of the Promissory Notes as described above.  Over the course of the scheme, ARONSON, BUONAURO and KONDRATICK returned a total of approximately $10.3 million to the inventors.  The total investor losses, therefore, were approximately $16 million.

      67.  The defendants ERIC ARONSON, VINCENT BUONAURO and ROBERT KONDRATICK used approximately $3.8 million of investor obtained funds to purchase and order Permapave pavers to the United States from Australia.  Consequently, there was

approximately $12.2 million unaccounted for.

68.  The defendant ERIC ARONSON used investor funds to pay his home mortgage payments in the amount of approximately $172,000 and his car payments, for three separate cars, in the amount of approximately $220,000.  Additionally, ARONSON drew checks from accounts holding investor funds, which were made payable to ARONSON, including net salary of approximately $79,500, totaling approximately $185,000.

69.  The defendant ROBERT KONDRATICK used investor funds to pay for his home mortgage payments in the amount of approximately $104,500 and his car payments, for two separate cars, in the amount of approximately $34,000.  Additionally, KONDRATICK obtained checks drawn from accounts holding investor funds and made payable to KONDRATICK, including net salary of approximately $172,000, which totaled approximately $314,000.

70.  The defendant VINCENT BUONAURO used investor funds to pay for his home mortgage payments in the amount of approximately $25,000.  Additionally, BUONAURO obtained investor funds in the form of checks drawn from accounts holding investor funds and made payable to BUONAURO in the amount of approximately $596,000, it is believed that approximately $275,000 was used as a down payment for BUONAURO's home purchase.

71.  The defendants ERIC ARONSON and ROBERT KONDRATICK used approximately $1.9 million of investor funds to pay American Express credit card expenditures.  The investigation has revealed

ARONSON and/or KONDRATICK had access to and used multiple
American Express cards during the course of the scheme.  These
American Express cards were not in the names of any of the
Permapave Entities.  Instead, the cards were issued in the names
of two Permapave employees and a Permapave investor, but the
authorized users of the cards included ARONSON and/or KONDRATICK.
The charges made by ARONSON and/or KONDRATICK were paid for from
one or more of the Permapave Entities' bank accounts.  Some
charges made by ARONSON and/or KONDRATICK appeared to be related
to legitimate business functions; however, ARONSON and/or
KONDRATICK also used the American Express cards to pay for
personal expenses, including, but not limited to, clothing,
watches, jewelry, vacations, and cars.  Moreover, the cards were
used to make purchases at merchants such as Rochester Big and
Tall, London Jewelers, Atlantis Bahamas Resort, Jet Blue, and
Lexus.  Many of the American Express charges appear to be
unrelated to legitimate business functions, and all were paid
using investor funds.

> 72.  Some examples of credit card charges made by the
defendant ERIC ARONSON and ultimately paid for with investor
funds include: a charge on or about March 14, 2008 for Wynn &
Company Jewelry located in Las Vegas, Nevada, totaling
approximately $12,600; six charges on or about April 17, 2009, on
three separate credit cards for the Atlantis Royal Tower located
in the Bahamas totaling approximately $20,800; ten charges on or

about July 12, 2010, for airline tickets aboard Jet Blue from New
York, New York, to Nassau, Bahamas, totaling approximately $5,800
for ARONSON and his family; three charges on or about July 25,
2010, for the Atlantis Royal Tower located in the Bahamas
totaling approximately $6,300.

73.  Some examples of credit card charges made by the
defendant ROBERT KONDRATICK and ultimately paid for with investor
funds include: a charge on or about October 25, 2008 for London
Jewelers for approximately $625; a charge on or about December
11, 2008, for Rolex Watch USA totaling approximately $1,100; a
charge on or about February 13, 2009, for London Jewelers for
approximately $800; and a charge on or about September 30, 2009,
for Lexus of Smithtown totaling approximately $1,070.

74.  Additionally, the invetigation has revealed
several instances where the defendants ERIC ARONSON and ROBERT
KONDRATICK issued checks to Permapave employees in amounts less
than $10,000 from accounts holding investor funds.  ARONSON
instructed the Permapave employees to cash the checks and return
the cash to ARONSON.  Some checks were signed by KONDRATICK.
ARONSON gave a portion of the cash back to the employee as
payment for cashing the check.  The investigation has revealed
that, on several occasions, multiple checks were issued and
cashed on the same day, at the same bank, moments apart from each
other, in the manner described above.

75.  Moreover, the defendant ERIC ARONSON used funds from an account that commingled investor funds and other funds in order to make periodic payments on the restitution ordered in his aforementioned criminal case before Judge Batts.  ARONSON used a total of approximately $29,700 from the commingled account to make the restitution payments.

WHEREFORE, I respectfully request that a warrant issue for the defendants ERIC ARONSON, VINCENT BUONAURO and ROBERT KONDRATICK so that each defendant may be dealt with according to law and that this affidavit remain under seal until further order of the Court.

MATTHEW B. TAYLOR
Special Agent
Federal Bureau of Investigation

Sworn to before me this
4th day of October,2011


HON. ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK